# UNITED DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

KEEVA THOMAS-ELLIS,      )
                               )
         Plaintiff,        )
                               )
vs.                            )     Case No. 4:07CV903 JCH/AGF
                               )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,   )
                               )
         Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Keeva Thomas-Ellis's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case be remanded for the award of benefits based upon a disability onset date of May 3, 2005.

Plaintiff, who was born on March 24, 1978, applied for disability benefits on October 7, 2005, claiming a disability onset date of April 1, 2004, due to a cerebral hematoma and neurosurgery thereafter. After her application was denied at the initial administrative level, Plaintiff requested a hearing before an administrative law judge ("ALJ"). A hearing was held on November 7, 2006, at which time Plaintiff amended her

alleged disability onset date to May 3, 2005, the date of the surgery.  On November 22, 2006, the ALJ issued a decision that Plaintiff was not disabled as of the date of the ALJ's decision.  Plaintiff requested review by the Appeals Council of the Social Security Administration, submitting new evidence of cognitive limitations following the surgery.

While her request for review was pending, Plaintiff filed a new application for disability insurance benefits, alleging a disability onset date of December 1, 2006.  The Appeals Council denied Plaintiff's request for review in the present case on April 5, 2007.  On May 8, 2007, Plaintiff's new application for disability benefits was approved at the initial administrative level.  Accordingly, this case involves the question of whether Plaintiff was disabled from May 3, 2005, until December 1, 2006.  Plaintiff argues that the Commissioner's decision is not supported by substantial evidence.  Specifically, she challenges the determination that she had no cognitive/mental impairments impacting her residual functional capacity ("RFC") to work.  Plaintiff asks that the decision of the Commissioner be reversed and that she be awarded benefits for the period in question.

## Work History and Application Forms

The record indicates that Plaintiff worked full-time as a machine operator from October 1999 until her surgery on May 3, 2005.  Plaintiff had previous work experience as a glassware washer and as a cashier.  On her Function Report, completed on October 28, 2005, and submitted in conjunction with her application for disability benefits, Plaintiff wrote that her daily activities consisted of taking care of her 15-month old child during the day, doing basic housework, fixing dinner, getting her older son from school,

and then eating, playing, doing homework, watching tv, and going to bed. She wrote that it took her longer to do things since her injuries, that she tired faster, and that it was sometimes hard for her to focus on things for a long time. She wrote that she went to church every Sunday, talked on the phone, and had people come over to see her. She could no longer work out because she could not use the left side of her body without tremors, and that she could no longer "[j]ust enjoy life." Id. at 67-74.

## Medical Record

The earliest medical evidence in the record is from April 2, 2004, when Plaintiff, who was then 26 years old and approximately five months' pregnant, went to the emergency room with complaints of dizziness that had begun the previous day. She was prescribed medicine and sent home, but her dizziness persisted, and on April 12, 2004, she returned to the emergency room, reporting dizziness, a slight facial droop, and intermittent double vision. Plaintiff was admitted to the Intensive Care Unit for neurological monitoring. An MRI of the brain and a cerebral angiogram showed a two-centimeter intracerebral hematoma in the left cerebellar hemisphere of unknown etiology. Plaintiff was discharged on April 16, 2004, with instructions from neurosurgeon Andrew Youkilis, M.D., to return for a follow-up MRI and examination in approximately two months. (Tr. at 465-66.)

An MRI conducted on June 23, 2004, showed virtual resolution of the hematoma, with a small residual lesion, leading Dr. Youkilis to suspect a cavernous hemangioma (a slow-growing benign vascular lesion) for which he recommended follow-up. Id. at 518.

On July 21, 2004, Plaintiff delivered a healthy baby (her second child) by cesarean section; she was discharged from the hospital on July 24, 2004. Id. at 451-52. On September 24, 2004, Dr. Youkilis wrote a letter "To Whom it May Concern," requesting that Plaintiff's maternity leave from work be continued until further notice. He stated that he was unable to treat Plaintiff's neurosurgical condition so soon after childbirth, and that he would send an updated return-to-work status report after Plaintiff's next visit to his office. Id. at 391.

On November 1, 2004, Dr. Youkilis examined Plaintiff. He noted that she had recovered completely from the hemotoma in April, but he recommended a surgical "resection" of her cavernoma, due to the risk of future hemorrhaging. Surgery was tentatively scheduled for January 18, 2005. Id. at 394-95. By letter dated that same day, November 1, 2004, Dr. Youkilis cleared Plaintiff to return to work "at fully [sic] duty under no restrictions," id. at 109, and on December 12, 2004, Plaintiff returned to full-time work. Id. at 62.

On February 16, 2005, Plaintiff rescheduled her "craniotomy" surgery for May 3, 2005, and the procedure was performed on that day. Id. at 436-38. On May 5, 2005, Plaintiff reported concerns about going home. A clinical flowsheet dated May 6, 2005, completed by nursing staff at the hospital, noted that Plaintiff was depressed. Id. at 133. Plaintiff moved that day from the hospital to a rehabilitation facility for continued inpatient rehabilitation to achieve functional independence. Jayarathne Kottage, M.D., examined Plaintiff at the facility and noted that while Plaintiff's surgery was

uncomplicated, Plaintiff had weakness and some incoordination. The rehabilitation plan

included physical, occupational, and speech therapy evaluations; and treatment to

improve Plaintiff's balance, coordination, and strength to achieve household ambulation

with or without the help of gait aids, achieve modified independence with activities of

daily living, and improve any cognitive deficits secondary to the surgery. Id. at 402-03.

On May 17, 2005, the rehabilitation facility noted that Plaintiff was generally

medically stable, initiating tasks, and responsive to therapy. Id. at 406. On May 19,

2005, Dr. Youkilis removed Plaintiff's sutures and found her to be alert and oriented. He

remarked that she had a subtle left-sided facial droop, which went away with activation;

"slow rapid alternating movements" in her left hand; and a spastic gait, with increased

tone in her left leg. Dr. Youkilis found Plaintiff's "continual and progressive

improvement" reassuring. He stopped the use of Decadron (an anti-inflamatory drug),

deferring to the medications to be prescribed by the rehabilitation facility for use upon

discharge. Id. at 388. Dr. Youkilis also wrote a letter stating that Plaintiff could not

work until further notice, and that he would send a return-to-work status report after he

saw Plaintiff at her next appointment on August 1, 2005. Id. at 389.

On May 24, 2005, Plaintiff was discharged from the rehabilitation facility with

instructions to pursue outpatient physical, occupational, and speech therapy. Dr. Kottage

reported that during her stay at the facility, Plaintiff showed mild to moderate cognitive

problems, and mild memory and attention problems. On discharge, Plaintiff's functional

status included independent eating; modified independent grooming and upper extremity

dressing; and supervised bathing, lower extremity dressing, and toileting.  Dr. Kottage noted that Plaintiff showed an increase in initiation, improved affect, decreased visual organization, and improved insight.  Id. at 243-44.

On June 8, 2005, Dr. Kottage prescribed physical and occupational therapy for Plaintiff two to three times a week.  Id. at 232-33.  On June 9, 2005, Plaintiff called Dr. Youkilis's office complaining of left hand heaviness and decreased coordination. Plaintiff was told that she would struggle for some time with coordination and sensory issues.  Id. at 117.  On June 20, 2005, an occupational therapist and a physical therapist each performed initial evaluations and set goals with Plaintiff.  The physical therapist reported that Plaintiff presented decreased strength, balance, and gait deviations that affected her walking.  Id. at 194-95.

Plaintiff received occupational and physical therapy approximately every three days through June and July 2005.  On July 8, 2005, Plaintiff called Dr. Youkilis's office, reporting that her left hand felt heavy, that she had been noticing "snake movements in the fingers," and that she still had some trouble with balance.  Id. at 116.  On the same date, an occupational therapist wrote to Dr. Youkilis that Plaintiff had participated in two trips and met all goals.  She picked up a bowling ball and shoes, manipulated money, and retrieved items from various levels in a grocery store.  The therapist also reported that Plaintiff had occasional loss of balance and used a cane for ambulation.  Id. at 246.[1]

---

[1]    An identical letter dated July 12, 2005, was sent to Dr. Kottage.  (Tr. at 218.)

On July 18, 2005, the occupational therapist reported that Plaintiff was able to stand for approximately 30 minutes before needing a break to rest. Plaintiff demonstrated good dynamic standing and balance, but continued to demonstrate tremors. The occupational therapist reported that Plaintiff appeared to be improving in all areas. Id. at 159-60. The physical therapist noted that Plaintiff stopped using her walker and instead used a cane. While she was stronger and had better balance, Plaintiff reported that she still occasionally felt like her left knee was going to buckle. The physical therapist noted that Plaintiff would benefit from continued physical therapy because Plaintiff had two young children and was hoping to return to work. Id. at 192-93.

On July 27, 2005, the occupational therapist reported that Plaintiff swept the floor using a dustpan, simulated a work situation where she sorted, stacked, and placed brochures in a box, and also simulated homemaking activities by pushing a cart and placing clothes pins on a clothesline, all without loss of balance. She performed tasks for three to four minutes and requested a break. There was a slight decrease in tremors, and Plaintiff exhibited good standing balance. Id. at 157.

On July 29, 2005, the occupational therapist reported similar findings. Plaintiff was able to dress and transport her one-year old child in a stroller, and her cognitive/perceptions status was considered good. The therapist reported that some athetoid-like movements (involuntary, purposeless movements seen in patients with cerebral palsy) were still present in Plaintiff's fingers. Plaintiff's balance was good and

she stood for up to 30 minutes without a rest break.  The therapist noted that Plaintiff appeared to have made gains in all areas.  Id. at 153-56.

On August 1, 2005, Dr. Youkilis examined Plaintiff and reported that her balance was slowly improving and that she was able to walk with a cane instead of a walker.  He encouraged Plaintiff to continue physical therapy and told her that it would be safe for her to return to work on a light-duty basis with no standing for more than four hours.  He also told Plaintiff that driving would be acceptable as long as someone else was with her in the car for the first several months of driving.  Id. at 392.  Dr. Youkilis filled out a form for Plaintiff to get a "temporary disability" placard, id. at 114, and wrote a letter stating that Plaintiff could return to work as of August 9, 2005, under light-duty restrictions, including not standing for more than four hours.  Id. at 387.  Three days later, however, on August 4, 2005, Dr. Youkilis wrote a letter excusing Plaintiff from work until February 1, 2006.  Id. at 386.  On August 12, 2005, Plaintiff's physical therapist reported that Plaintiff made good progress in gait, strengthening, and balance.  Id. at 182-83.

On December 6, 2005, Dr. Youkilis filled out an Attending Physician Statement for a private insurance company.  He indicated on the check-box form that in a workday, Plaintiff could sit and stand for four hours intermittently and walk for two hours intermittently, never climb or operate heavy machinery, occasionally twist/bend/stoop, frequently reach above shoulder level, never lift more than 50 pounds, occasionally lift 20 to 50 pounds, frequently lift up to 20 pounds, perform fine finger movements with her left

hand occasionally and right hand frequently, perform hand-eye coordinated movements occasionally, and push and pull frequently with both hands. Dr. Youkilis indicated that there were no cognitive deficits or psychiatric conditions that interfered with the ability to perform Plaintiff's occupation. He noted that he had not advised Plaintiff to return to work, and that he expected improvement in Plaintiff's capabilities by February 2006, at which time he expected her to return to work part-time. He also restricted Plaintiff from work involving climbing or heights, and noted limitations in her fine motor coordination skills. Id. at 107-08.

On December 21, 2005, Barry Rosenblum, M.D., wrote to Dr. Youkilis that he had seen Plaintiff, and observed strong rotary nystagmus (involuntary movement of the eyes) in all gazes. Noting that Plaintiff certainly had reason to have cerebellar dysfunction, Dr. Rosenblum ordered tests to discern the possibility of labyrinthine disease.[2] Id. at 242.

On April 17, 2006, Dr. Rosenblum filled out a Physical Medical Source Statement in connection with Plaintiff's application for Social Security disability benefits. He reported that Plaintiff could sit for an unlimited period of time, stand for 15 minutes, walk for 15 minutes, occasionally lift and/or carry five pounds, and never lift or carry over ten pounds. He indicated that Plaintiff did not have significant manipulative limitation of the ability to handle and work with small objects with the right or left hand, but that she had

---

[2] An inflammatory disorder of the inner ear producing disturbances of balance.

a visual limitation that would prevent seeing small objects at work and avoiding ordinary workplace hazards; had a limitation that would prevent the ability to hear and understand simple oral instructions or communicate simple information; was limited in balancing even when standing or walking on level terrain; could occasionally reach above her head and stoop; could frequently tolerate exposure to odors or dust and occasionally tolerate exposure to noise; did not have a medically determinable impairment that could be expected to produce pain; and should use a cane or other assistive device.

Dr. Rosenblum indicated that Plaintiff's impairments would not cause the need to lie down or take a nap during a normal eight-hour work day, and that it was unknown if any of her impairments would cause her to take more than three breaks during an eight-hour work day. He opined that the limitations he had assessed had lasted, or could be expected to last, 12 continuous months, and that December 2005 was the earliest date on which the limitations existed at the assessed severity. Id. at 379-82.

After a follow-up examination of Plaintiff on June 8, 2006, Dr. Youkilis noted that Plaintiff was "doing well," having made a "remarkable recovery" from the brain surgery of one-year earlier. She was able to walk without a cane. Nevertheless, she had intermittent headaches and incoordination of the left upper extremity, for which Dr. Youkilis recommended a neurological referral. He provided Plaintiff with a handicapped parking sticker for 180 days, and "encouraged her to try to return to work as soon as she feels up to it." Id. at 384.

**Evidentiary Hearing of November 7, 2006**

Plaintiff and a vocational expert ("VE") testified at the evidentiary hearing. Plaintiff, who was represented by counsel, testified that she was 28 years old and had received her GED in April 2005. She testified that she had worked as a glassware washer for approximately one and one-half years, and as a cashier in customer service for two years. Her job in 2005 prior to her surgery was as a machine operator. She stated that she did not return to work after her surgery and was still unable to do so because her balance was off. She stated that she did not attempt to find work as a cashier because she felt she would be putting herself and the person who hired her "in danger." Id. at 546-48.

Plaintiff testified that she was a single mother with two children, aged two and eleven. She stated that she had problems "basically just being a mom," and that she was not able to do things on her own since the surgery. Even though her doctor indicated that she could start driving in August 2005, she did not drive because she was "very scared." She said that her peripheral vision did not enable her to focus on things moving past her at a fast pace. Id. at 548-49.

In addition to her vision and balance problems, Plaintiff testified that she had bad coordination, and trouble remembering things and focusing, all of which affected her ability to work. She stated that she had not seen, nor been referred to, a psychologist regarding her memory problem. Id. at 550.

Plaintiff testified that her father had driven her to the hearing. She said that her father helped her with cooking, household chores, and grocery shopping. She needed

help cooking because she could not lift things and became confused when trying to follow a recipe. She said that she had trouble balancing herself without a cane, and that her sister helped her with "business matters" because she became confused when she read things. Her sister also helped her with other things when her father, who was with Plaintiff most of the day, was not available. Plaintiff testified that the longest she went during the day without help from her family was about three hours, and that there was never a day that she went without such help. Id. at 550-52.

The ALJ presented several hypothetical questions to the VE. The ALJ asked the VE whether an individual of Plaintiff's age and education, who could lift and carry up to 20 pounds occasionally and ten pounds frequently, sit for six out of eight hours, and stand or walk for six out of eight hours, with no further restrictions, could perform Plaintiff's past work (in a factory, as a glassware washer, and as a retail cashier). The VE responded in the affirmative. Id. at 553-54.

The ALJ then posed a hypothetical question based on Dr. Rosenblum's May 6, 2005 report. He asked the VE whether an individual of Plaintiff's age and education, who could lift and carry up to five pounds occasionally and less than five pounds frequently, sit for eight hours, stand or walk for one half-hour out of eight, needed a hand-held device, "could occasionally balance," should avoid concentrated exposure to noise, and who has unspecified limitations on visual, hearing, and speaking, could perform Plaintiff's past work. The VE responded in the negative, but that such a person could perform some sedentary assembly jobs, of which there were about 1,500 locally.

The VE also stated that if there were no other cognitive limitations, such a person could perform the work of an information clerk or a receptionist, and that there were about 8,000 such jobs locally.  Id. at 554-55.

The ALJ's final hypothetical was based on Dr. Youkilis's December 6, 2005 statement.  The ALJ asked the VE whether an individual of Plaintiff's age and education could perform Plaintiff's past work if the person could lift and carry up to 50 pounds occasionally and 20 pounds frequently, sit for four hours out of six, and stand and/or walk for six hours out of eight; should only occasionally climb stairs and ramps, never ropes, ladders, and scaffolds; could occasionally stoop and kneel; could not do work requiring repetitive fingering, fine manipulation, and pushing and pulling with the arms; and  should avoid all exposure to the hazards of dangerous and moving machinery and unprotected heights.

The VE answered in the negative due to the repetitive fingering limitation.  The VE stated that a job as a cashier and a glassware washer would involve more than occasional fingering.  The VE said that work as a machine operator would involve gross manipulation such that one would have to use both hands on more than an occasional basis.  The VE testified, however, that the hypothetical individual could work in the sedentary-work category as an information clerk or receptionist (approximately 8,000 jobs), and in the light-work category as an unarmed security guard (approximately 9,000 jobs).  Id. at 555-58.

Plaintiff's attorney then asked the VE whether an individual with the limitations indicated in Dr. Rosenblum's May 6, 2005 report, specifically the visual and communications limitations, could perform any of the jobs the VE had identified, and the VE responded in the negative. The VE also testified that if Plaintiff's testimony regarding the degree of assistance she needed for simple tasks and decision-making "on the mental side" were credible, she would not be able to perform any of the jobs the VE had identified. Id. at 558-60.

Plaintiff's counsel then requested that the record be held open so that he could obtain a neuropsychological evaluation of Plaintiff's memory. The ALJ stated that counsel should have done that earlier, but noted that anything submitted before the decision was issued would be considered, and that that should give counsel "at least a 30-day window." Id. at 560-61.

**ALJ's Decision of November 22, 2006**

The ALJ issued his decision 23 days later; no new evidence had been submitted at that point. The ALJ summarized the medical record and found that it established that Plaintiff had cavernous hemangioma and status post posterior fossa craniotomy. The ALJ found, however, that the record did not indicate a medically determinable mental impairment, noting that Dr. Youkilis had described Plaintiff's cognitive issues as mild and did not refer her for additional testing or services. The ALJ also noted that if Plaintiff

had experienced the sorts of cognitive issues suggested, then it would be difficult for her to help her oldest son with his homework and it would be much more difficult for her to live independently with her children.

Id. at 13-14.  The ALJ concluded that the combination of Plaintiff's impairments, though severe, did not meet the criteria for a deemed-disabling impairment listed in the Commissioner's regulations.

The ALJ then found that Plaintiff had the RFC to perform work that required lifting and carrying up to 50 pounds occasionally and 20 pounds frequently; sitting for up to four hours, standing for up to four hours, and walking for up to two hours, all in an eight-hour workday; only occasionally climbing stairs and ramps, stooping, and kneeling; no climbing ropes, ladders, or scaffolding; no repetitive fine manipulations and pushing and pulling with arms and hands; and no exposure to workplace hazards, such as unprotected heights and dangerous moving machinery.  Id. at 14.

The ALJ stated that the short-term disability payments Plaintiff was receiving from her former employer appeared to be based upon Plaintiff's inability to perform her prior work (as a machine operator), rather than an inability to perform any substantial gainful activity, and that these payments might be inhibiting Plaintiff's incentive to work.  The ALJ remarked that Dr. Youkilis encouraged Plaintiff (on June 8, 2006) "to return to work as soon as she felt up to it," which suggested that Plaintiff was "capable of working anytime she feels up to working," and that there was "a potential element of secondary gain."  Id. at 16.

The ALJ found that Plaintiff's "significant" daily activities in performing household chores and caring for her children were inconsistent with her claims of disabling symptoms. He did not afford "much weight" to Plaintiff's allegation that she was concerned about harming herself if she tried to work, because the record "strongly suggest[ed]" that Plaintiff drove with her children in her car. The ALJ stated that Plaintiff required minimal medical attention, and that the symptoms she reported to those providing medical care were not as severe as the symptoms alleged in her application for disability benefits. He stated that while Plaintiff reported that she was afraid of falling, there was no evidence that she had ever fallen. In sum, the ALJ did not find Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms "entirely credible." Id.

The ALJ believed that Dr. Youkilis' opinion, as the treating neurosurgeon, should be afforded greater weight than that of Dr. Rosenblum, who only examined Plaintiff once, and that the ALJ's RFC assessment was consistent with the limitations imposed by Dr. Youkilis, and reflected what Plaintiff's RFC was, not right after her surgery, but within 12 months thereafter. The ALJ stated that even though Plaintiff may experience trouble with her balance and left arm tremors, these symptoms did not establish a disability within the meaning of the Social Security Act. Furthermore, according to the ALJ, the alleged level of impairment from these symptoms was inconsistent with the preponderance of the evidence as a whole. Id.

The ALJ determined that Plaintiff could not return to any of her former jobs, because each required repeated use of her hands and arms for fine and gross manipulations. However, based upon the VE's testimony that an individual with Plaintiff's RFC, age, education, and work experience could work as an unarmed security guard (unskilled work at the light exertional level), and clerk/receptionist (unskilled work at the sedentary level), the ALJ found that Plaintiff was not disabled. Id. at 19.

**New Evidence Submitted to the Appeals Council**

Along with her request for review of the ALJ's decision, Plaintiff submitted a report by F. Timothy Leonberger, Ph.D., dated December 12, 2006, of a neuropsychological screening evaluation of Plaintiff conducted on November 21 and 29, 2006. Thereafter, while the request for review was pending, Plaintiff submitted a Mental Source Statement completed on February 5, 2007, by Joseph M. Dooley, Jr., M.D., a member of the same neurological practice as Dr. Youkilis. The Appeals Council acknowledged receipt of both new pieces of evidence. Id. at 6.

Dr. Leonberger's report noted that Plaintiff was referred to him for assistance in determining whether she was disabled due to alleged "concentration/memory issues, S/P [status post] stroke, S/P brain surgery to remove blood clot (equilibrium off, left-side tremors, arm and leg), poor vision, inter-ear problem." Dr. Leonberger observed that during his clinical interview of Plaintiff, she appeared depressed and cried several times, notably when she discussed her memory problems, but she was able to compose herself. Dr. Leonberger considered the results of the tests he conducted to be valid and reliable.

17

These results showed that Plaintiff's verbal IQ score was 82 (low average range), performance IQ score was 73 (borderline range), and full scale IQ score was 76 (borderline range). Her performance was in the "extremely low range" for tasks requiring auditory concentration, mental manipulation of well-known variables, and immediate memory; and she performed "very poorly" on a subtest requiring visual concentration. Id. at 527-31.

Dr. Leonberger opined that it appeared that Plaintiff suffered significant cognitive decline from prior levels of functioning on most neuropsychological measures. He also noted that Plaintiff's visual/spatial abilities, attention/concentration, psychomotor speed and memory appeared to be significantly lower than prior levels of functioning. He found that Plaintiff had dementia due to cerebral and cerebellar hemorrhage and the subsequent craniotomy. He diagnosed a current and year-high Global Assessment of Functioning ("GAF") score of 40,[3] and assessed the following functional limitations: marked impairment in activities of daily living; mild to moderate impairment in social functioning; marked impairment in concentration, persistence and pace; and marked to severe impairment in deterioration or decompensation in work or work-like settings. In

---

[3]     A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31 to 40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" impairment in these functional areas; scores of 51 to 60 indicate "moderate" impairment; scores of 61 to 70 indicate "mild" impairment.

his opinion, Plaintiff was not capable of handling funds in her own best interest.  Id. at 531-35.

Dr. Dooley indicated in his statement[4] that Plaintiff had mild to moderate limitation in many areas; marked limitation in the ability to function independently, sustain an ordinary routine without supervision, respond to changes in work setting; and extreme limitation in the ability to complete a normal workday and workweek without interruptions from symptoms, perform at a persistent pace without an unreasonable number and length of rest periods.  Dr. Dooley further indicated that Plaintiff had a substantial loss of ability to understand, remember, and carry out simple instructions; make simple work-related decisions; and respond appropriately to supervision, coworkers, and ususal work situations.  Dr. Dooley opined that these limitations lasted or could be expected to last 12 continuous months at the assessed severity, and that they began in April 2004.  He also diagnosed unsteady gait, incoordination in left upper extremity, depression, mild loss of memory, mild daily headaches, and blurred vision, all secondary to the hematoma and May 3, 2005 craniotomy.  Id. at 539-42.

**Appeals Council's Decision of April 5, 2007**

In denying Plaintiff's request for review, the Appeals Council stated as follows:

---

[4]    It is not clear from the record whether Dr. Dooley had treated or examined Plaintiff prior to the date that he completed his Medical Source Statement.  It appears to the Court that he had not, and that he based his opinions on his review of the record.  But Plaintiff states in her brief to this Court that Dr. Dooley was at the time her treating neurologist.

The neuropsychological evaluation performed by F. Timothy Leonberger, Ph.D., is overly restrictive and is inconsistent with the other evidence of record. The decision relied on the opinion of Dr. Youkilis, who is your treating neurosurgeon. Dr. Youkilis returned you to fulltime [sic] work with no restrictions (Exhibit F, page 411) [Dr. Youkilis's letter of November 1, 2004]. He later indicated that you could perform a range of light and medium work (Exhibit F, page 412) [Dr. Youkilis's December 6, 2005 statement].

This new information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. at 3.) The Appeals Council did not mention Dr. Dooley's statement.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)). Where, as here, the Appeals Council has considered new and material evidence and declined review, the

court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423(d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in

four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I.  If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any.  If the claimant has past relevant work and is able to perform it, she is not disabled.  If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as

22

pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE. At step five, only an ability on the part of the claimant to do full-time work will permit the ALJ to render a decision of not disabled. Bladow v. Apfel 205 F.3d 356, 359 & n.6 (8th Cir. 2000).

**Evaluation of the Evidence and Assessment of Plaintiff's RFC**

Plaintiff argues that the Commissioner's decision is deficient because it did not properly evaluate Dr. Leonberger's December 12, 2006 report, and did not mention Dr. Dooley's February 5, 2007 statement at all. Plaintiff argues that the ALJ's RFC is deficient for other reasons as well. She points to the discrepancy between the ALJ's determination that Plaintiff could, sit, stand, and walk for a certain number of hours and Dr. Youkilis's December 6, 2005 opinion, upon which the ALJ relied, that Plaintiff could only do these things for those hours intermittently. More significantly, Plaintiff points to the ALJ's failure to note that Dr. Youkilis indicated in his December 6, 2005 report that Plaintiff could return to work part-time, rather than full-time.

The Commissioner argues that in assessing Plaintiff's RFC, the ALJ was entitled to adopt "the bulk" of Dr. Youkilis's opinion regarding Plaintiff's limitations, as Dr. Youkilis was Plaintiff's treating physician. The Commissioner further argues that the Appeals Council's treatment of Drs. Leonberger's and Dooley's reports was well-supported by the evidence in the case, in that these reports finding cognitive limitations were inconsistent with Dr.Youkilis's failure to indicate that Plaintiff suffered from mental limitations that would prevent her from working. The Commissioner states in addition

23

that, as Dr. Dooley does not appear to have ever examined or treated Plaintiff, his opinion is deserving of little weight.

The Court agrees with Plaintiff that when considering the record as a whole, including Dr. Dooley's and especially Dr. Lineberger's opinions, the ALJ's decision is not supported by substantial evidence. Dr. Youkilis never conducted mental-capacity testing and his only opinion of Plaintiff's cognitive ability to maintain a job is in the form of a check on the December 6, 2005 check-box insurance form, indicating that there were no cognitive deficits or psychiatric conditions that interfered with Plaintiff's ability to perform her occupation. The Court does not believe that the record evidence provides a sufficient basis to discredit Dr. Lineberger's test results and opinions. The Appeals Council's reliance on Dr. Youkilis's November 1, 2004 letter returning Plaintiff to work at full duty with no restrictions was clearly in error, as the letter related to a time prior to Plaintiff's surgery and alleged disability onset date.

The Court also finds problematic the ALJ's reliance on Plaintiff's mention in her Function Report that she did homework (presumably with her older son), to conclude that her cognitive issues were not as serious as suggested. The ALJ's finding that Plaintiff was able to live independently is also questionable in light of Plaintiff's testimony that she required the daily help of her family to get through each day, testimony which the ALJ did not specifically address or reject. In sum, the Court believes that the decision of the ALJ must be reversed, as the record as a whole simply does not support the ALJ's finding.

The Court further believes that the record establishes that for the period in question, Plaintiff did not have the emotional mental capacity to work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world," and that accordingly, the case should be remanded to the Commissioner with directions to award benefits based upon a disability onset date of May 3, 2005. See Duncan v. Barnhart, 368 F.3d 820, 824 (8th Cir. 2004) (reversing the decision of the ALJ and directing the district court to remand disability case to the Commissioner for an award of benefits where the record did not support a holding that the claimant could work under real-world conditions); Jones v. Barnhart, 335 F.3d 697, 701 (8th Cir. 2003) (same, where the record did not support the ALJ's finding that the claimant's speech impairment was just "slight or minimal"); Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (same, where there was substantial medical evidence on the record as a whole from claimant's treating mental health providers that she suffered from marked disabilities that would interfere with her ability to work); Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001) (same, where the clear weight of the evidence pointed to the conclusion that the claimant was disabled; "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate."). This conclusion is further supported by the Commissioner's decision that Plaintiff was disabled as of December 1, 2006, there being no suggestion that her condition worsened between her alleged disability onset date and December 1, 2006.

## CONCLUSION

The Court concludes that the Commissioner's decision that Plaintiff was not disabled as of her alleged onset date is not based upon substantial evidence in the record as a whole. The Court further concludes that the record establishes that Plaintiff was disabled as of her alleged disability onset date.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for the award of benefits based upon a disability onset date of May 3, 2005.

The parties are advised that they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 13th day of June, 2008